Thank you, your honor. May it please the court, my name is Kimberly Albrow and I'm here on behalf of the appellant Kurt Steffen. Today I'm going to discuss why Mr. Steffen is not a manager or supervisor worthy of the enhancement that he received and I will briefly address the safety valve issue. First, the district court's findings, they're in the joint appendix at 165 and 166. The court listed off several findings that are largely related. Tell us first, since we're here on appeal, how are we to review these? I'm glad you asked. I was going to get to that, but I'll start with that. I think that the facts that I was about to outline, Mr. Steffen doesn't dispute most of those facts. I would say he disputes that he had the ability to quote unquote pull the plug on the entire operation and I think that that would be under a clear error review whether or not you agree that he had the ability to pull the plug on the entire operation. We do dispute that factual finding. However, I believe the remainder of our argument is under a de novo review because we believe that the facts as found by the district court are not sufficient to satisfy the manager-supervisor enhancement. What's interesting to me is that criminal defendants never think anything is reviewed under a clearly erroneous standard. Never. It's always split. It's always broken down. Sometimes you do break it down on that, but this is a sentencing matter and don't our precedents say that this is reviewed under a clear error standard? Manager and supervisor determination and how much of a leadership enhancement? I do think that it's confusing, but there's also the standard of the facts are reviewed for clear error and the legal issues are reviewed de novo. No, but the clear error standard is designed to indicate that this is taking the matter as clear error as a whole is designed to indicate that this is a matter on which we want to give the judge, the district judge, an awful lot of discretion because the legal conclusions are not necessarily something that's separate and apart from the facts. They're drawn from the district court's impression of the facts and the district court's greater familiarity with hearing what the district court hears during a sentencing. I just feel like this clear error standard is getting muddied and bifurcated and in some cases that's right. Ornalis in the Fourth Amendment search and seizure context makes a split between a clear error standard and a de novo standard. But when we're talking about the sentencing determinations under 3B or what have you, whether you have a 2, 3, or 4 level offense, base offense enhancement, we say it's clear error, which is meant to convey something important, which is that the district court has a primary role in the sentencing function. Well, I do think it's confusing, but I stand by the fact that the facts, when we're disputing the facts, we would clearly be subject to the clear error standard because you do give deference to the district court when they make the factual findings. The judges at the district court level are the ones who have the first-hand knowledge of the evidence more so than appellate judges would have. But when it comes down to the point of whether or not legally the facts are sufficient, and I think that's particularly important in this case, because there is case law in this circuit that shows that the manager-supervisor enhancement can't be based solely on the supervisor. And I think that's a legal issue, and I think it's hard to then apply the clear error standard to whether the facts of a particular case are, I think it's more than just the clear error standard. I think that would be the de novo review. But if we assume, just assuming, that there are facts in this case that go beyond mere supervision of property, is it your position that the district judge's application of the facts to the legal standard, I don't think there's a dispute over the legal standard here, is the application of those facts to the legal standard in sentencing subject to de novo review? I believe that it is. And there's also the additional standard. I'm sorry, I lost my place. And it is confusing. And I'm not saying that there's clear law on this, but when the sentence then is based You know, it happens every day in terms of a sentencing in a federal court, in a district court, in this circuit, much less throughout the country. And it seems like, to me, our law has been fairly clear that there's significant deference given to the district court judge's not only determination of what the facts are, but if there's no dispute over what the legal standard is, how those are applied. But there's also the, you know, an improperly calculated guideline range can be found unreasonable, too. So you have the, in addition to the legal and factual difference of standard of review, you also have a determination of whether or not the guidelines calculation is wrong. The problem with that position seems to me to be that nothing would be subject to clear error review other than an individual factual finding under your analysis. There would be no such thing as clear error review. You pretty much wipe out that category of review. I could see that that could be the case, but I think even in these circumstances, let's just assume, based on what you've asked me about, that I came in here and said all of the facts, we don't disagree with these facts, I would be subjected to the clear error review. Yeah, I mean, my problem is that, you know, you have an opinion in the Supreme Court like Gall, which said that the district court is the primary sentencing authority, and constructed a standard of review to make that lesson plain. And then we hear this stuff about, well, it's clear error in this way and it's de novo in this way, and that's nothing but an effort to circumvent the Supreme Court's insistence that district courts are primary sentencers and that the standard of review is designed to protect their role and not to have the courts of appeals get into this to an inordinate degree where the inquiry below was heavily factual in nature. Well, I think the two cases that I cited, Slade and Cameron, go to that issue because those were cases where it was a supervisor and managerial role in Slade and then it was the leadership role in Cameron. And I think the court had to determine that based on this mixed kind of... Yeah, but those are different cases because their roles, Slade or Cameron's role could have been assumed by anybody, but in Stephan's case, he was indispensable. You don't have Stephan, you don't have the operation because they don't have it. He's got three different places in his property, three different greenhouses or whatever you call them, where marijuana plants are growing. So he can pull a plug on it at any time or he can let the operation go forward at any time. He's got three different places where these marijuana plants are growing. And so unlike these other cases, Slade and everything, where the people were sort of fungible and were interchangeable, you know, this guy's indispensable. Well, we disagree that he's indispensable and these are the reasons why. If you were in the operation, you might not disagree. Well, that's the fact that I mentioned to begin with, that he could pull the plug on the entire operation. First of all, the plants were not planted in the ground on his property. They were in containers and at the time that the officers executed the search warrant, one-third of the plants were being loaded to be moved elsewhere. And the way this case was indicted, it was indicted based on a much larger conspiracy and Mr. Stephan was involved in one of those locations of five. And they could have moved these plants, which were in containers, which were loaded into a truck, to any one of these other locations. Mr. Ryan Harris was involved in a location where the officers recovered 499 plants. So presumably there was room for... The district court took over. I mean, we were re-arguing the facts. And like I said, that's a fact that we dispute and we would be subject to the clear error review. But also, the Cameron case that I cited at 573 F3D 185 also makes a distinction, which I think is critical in this case. And that is that although the court found that Mr. Stephan could pull the plug at any time, this confuses whether he actually ever tried to pull the plug, threatened to pull the plug, exercised his authority over his co-defendants by saying, I'm going to shut down this screw operation because I own the land and provide the electricity. And Cameron said that you cannot confuse potential authority with actual authority. And there was nothing in the facts. What about the issue... You know, Slade talks about management responsibility, exercising management responsibility. And what I find really troubling in this case is his actions in his police car. The fact that he was following Armando when Armando was transporting the marijuana to prevent other law enforcement agencies from stopping them. Now, why isn't that exercising supervisory authority over Armando, using his position as a police officer and his police vehicle to supervise the delivery and transportation of the marijuana? Why isn't that come within the umbrella of Slade exercising management responsibility? I know the trial court didn't rely on that, but that just kind of leaps off the page to me as some supervisory exercise of authority on his part. Well, I think he has to... I think he's using his patrol car improperly for which he got an enhancement and that was raised at the district court. Why isn't he supervising Armando's delivery by doing that? Because I don't think there's any evidence that he actually directed how Armando was going to drive, where he was going to drive. It doesn't show that he's exercising... Right, because Armando, I'm following you. I am shepherding this operation with my patrol car because nobody's going to stop you if I can protect you. Isn't that... Why couldn't the court find that was supervisory authority? Well, as you point out, the court didn't find that. I suppose a judge could have found that. That was not a finding, and I don't think that necessarily shows that he had control over Armando. They could have agreed together that that's the way they were going to do it. In the record, Mr. Stephan used private vehicles sometimes. I don't think it's any different other than the fact that he used a patrol car and he was given an enhancement for the abuse of his position. Apart from impersonating a policeman, what about the co-defendant whom he required to assume and pay the electric bill? These electric bills tend to be very high because marijuana growing requires an enormous amount of electrical power. And as I understand it, he recruited or rather compelled a co-defendant to put the electrical bill in the co-defendant's name so that the co-defendant would be the scapegoat once the exorbitant electrical operation of the electrical consumption, which was bound to have been exorbitant, attracted suspicion. I mean, the electrical bills for these sorts of operations are just sky high. We all know that. And so Mr. Stephan says, well, you have the electrical bill in your name. Now, you know, he's somebody in a superior position, in a supervisory position, dictating that to an underling. There's no evidence. That's the government's position. There's no evidence whatsoever that he forced Mr. Verdugo to assume the electric bill. Mr. Verdugo made many claims against Mr. Stephan, but if you read in the PSR what he said… It was initially in Mr. Stephan's. No, no, no, not initially. Later on, whose name was the utility bill in? It was in Mr. Verdugo's. Well, did he just say, oh, I'd like to assume the electrical bill. This would be such a pleasure to have the electrical bill and the utility costs paid by me and in my name. Well, he was living out there. So the point is there's no evidence whatsoever that Mr. Stephan forced him to put it in his name. Mr. Verdugo never claimed that. How do you – what do you think is the explanation that the bill, the utility bill, just all of a sudden changed names? My time is up. Do you want me to answer? Yes, sure. Okay. I have no idea. I can't guess what Mr. Verdugo or what Mr. Stephan were thinking. All I can tell you is there is nowhere in the record where it – where that assertion by the government is shown. Even Mr. Verdugo, who was willing to say a lot of things about Mr. Stephan that weren't favorable, he never said he felt threatened or never said that he was forced to put that electric bill in his name, and there is evidence that he lived on the property. I mean, if you're renting from someone and live on the property, you may want the electric bill in your name. That's my only supposition. You know, if you – if Mr. Stephan is – he seems to be impersonating a police officer and going to some lengths to sort of shield himself and the operation from public scrutiny. But I would point out that Mr. Stephan was not with the highway patrol when this operation began, and he was not with the highway patrol at the time he was caught. Why is that relevant? Simply because – He was with the highway patrol while it was going on. For part of the time, but my point on that is that he doesn't – that it did not make him necessary to the operation just to have that patrol vehicle because the operation went on before he had the patrol vehicle and after. Thank you. Well, you have some time for rebuttal as well. Mr. Bianchi. Good morning, Judge Agee, Judge Wilkinson, Judge Keenan. My name is Nick Bianchi. I'm here on behalf of the government in this case, and there's two arguments I'd like to make. The first is that the district court correctly held that the appellant was a manager or supervisor, and the second is that it correctly applied the weapons enhancement and that the appellant did not meet his burden of showing there was no connection between the weapons and threats and the operation here. The weapons enhancement, is that an issue here, or is it just the application of a safety valve? Well, I think in their brief they couched it in terms of the weapons enhancement being improperly applied, but the ultimate concern there is whether or not he gets the safety valve of the appellant. If somebody is a manager or supervisor, does a manager or supervisor of a drug operation have been given safety valve treatment? No, so if the district court was correct in holding him to be a manager or supervisor, then we stop there. Okay, that's what I thought. Why don't you tell us about the standard of review here and how you would compare your view to your colleagues? Our position is that it's clear error. We cite Cameron in our brief where it says that this court's review of a district court's determination of an offense enhancement is clear error. I think Judge Wilkinson was correct when he said that the ultimate decision by the court is based on its factual findings, and I think if you do start to try to bifurcate all that, it's a dangerous road, and I think it does sort of muddy the waters and really makes it hard to tell when clear error is ever appropriate. So I think the correct standard of review here is clear error because we are dealing with offense enhancements. Now, while not argued here before you today, I would note that the appellant in their brief, they rely repeatedly on findings of the district court from the suppression hearing. However, those findings were based on evidence presented at that time. At that time, the appellant was taking a position directly opposite of what he ultimately admitted to when he pled guilty. So I don't believe it's appropriate to consider what the district court held in terms of his involvement at that stage, at the suppression hearing stage. It says, you say on page 12 of your brief, that Stephan was responsible for inviting co-defendants to participate in the operation he wanted to establish on his property. Which co-defendants were those? At the beginning of it, it would have been Ryan Harris, Armando Verdugo, and John Garzon. I'm not sure. So he invited them to come along and participate in this operation? To set up a grow. They were the ones that knew how to grow marijuana. He did not have any experience in that. He invited them to come help him set up the operation on his property, yes. I don't think they would not have been there but for his invitation to come grow. They would never even have known he owned this property. So they would not have been at the Stable Lane property but for his invitation. All right, and what do you say about Judge Keenan's point about directing as a police officer, taking over and directing somebody's travel plan? I agree with that completely. I think we all agree that that was not a fact specifically referenced by the District Court. But I think that certainly shows control or authority over Armando Verdugo. Of course, we also have that he transported marijuana. Because we can affirm on any ground. Yes, Your Honor. I think that is absolutely an exercise of control over Armando Verdugo. Along those lines, I think... So is it your view that the appellate court would be able, based on this record, that it would be clear upon the record that the defendant, when he was following in his police car, was directing the other gentleman where to go and providing him with security services at his behest at that time? Yes, Your Honor. I believe this court can affirm the District Court's opinion on any ground before it, on anything raised before it, whether it be in briefs. Would that require us, though, to engage in fact-finding? That's what I'm still unsure of. Right. It has to be apparent on the record. I think it may go as far as you may have to take the additional step of a harmless error analysis by stating that there's this other fact out there that wasn't considered by the court and that if that's appropriate, then if it were remanded and the District Court simply added that one sentence and then it would be affirmed after that, then there's no reason... Is that fact disputed? I don't believe so. I think he admitted on at least one occasion to following Mr. Verdugo. He obviously admitted to using his patrol car to transport marijuana for the operation. Our position is also that there's an inherent understanding among the other co-defendants that Mr. Steffen's in a position of authority because he is the one police officer in all this, especially once the power is out of his name. He has the ability not only to say, get off my property, but being in his position to go to his friends in law enforcement. If facts in the pre-sentence report are not disputed in a sentencing hearing, those facts go down as true. Correct. Our precedent in United States v. Terry indicates that. Yes, Your Honor. At a sentencing hearing, a District Court must resolve disputed facts, but the business is there's a pre-sentence report that's handed to the defendant. Correct. And you say, okay, which of these facts do you take issue with? Correct. And that's the defendant's burden. And as I say, our Terry case makes that very clear. And if the defendant doesn't take issue with them, those facts ought to be admitted. Correct. Absolutely. And the only facts he took issue with here were the threats. He did not make any objections to any of the facts that were used by the District Court to find that a three-level enhancement for manager or supervisor was appropriate. What about the electrical bill and the other fellow's name? Your Honor, while the record may not be as clear as we would like on it, certainly it was switched to Mr. Verdugo's name. How did the switch come about in your view? We had the paperwork on that. They both, just like with any power, as far as the literal switch or the decision to switch? They do both. The literal switch was Mr. Stephan and Mr. Verdugo both signing off on paperwork allowing the power company to switch the power to Mr. Verdugo's name. You can't just go into a power company by yourself and say, I want the power in my name at this place. The decision to switch was made because the power bills were starting to get too high. Mr. Stephan did not want to be particularly in his position in law enforcement, and the fact that he owned the property, did not want himself any further associated with that property and what was going on there, so he had Mr. Verdugo take over the power. What was the relationship between Mr. Stephan and Mr. Verdugo? At that time, they were all involved in the marijuana grow on Mr. Stephan's property. But what was the relationship between those two? Just friends in terms of beyond just friendship. Did Verdugo live on the property? That is their position. That is a position that Mr. Armando Verdugo took in state court, which he would later tell us was a bad decision. But that was a position he took in an effort in state court to have the search warrant of the property suppressed. Later on, he stated there were certainly occasions he stayed out there, but he did not live out there. He primarily, I believe, stayed at the residence where Mr. Stephan ultimately took, admitted to taking marijuana in his patrol car. Are there any facts in the record that show a dependence of the other co-defendants on Mr. Stephan other than the fact that he provided the location for this grow operation? Anything, something from which authority or management or supervision could be inferred reasonably? I think we've got, as Your Honor stated, the following Mr. Verdugo, Mr. Armando Verdugo for one of his deliveries. We've got the threats that are discussed in the issue. I certainly believe those go to authority over his co-defendants. I know they dispute those, but our position is they are accurate. Did he front the startup costs? He did. He paid for the initial shed out there. When they bought the property, there was a large, it's called a conics box, just a metal shipping container out there. Mr. Stephan paid for a shed to start the marijuana grow. He also got the power run out there. There was no power out there, so he had to pay to get it installed. And he also paid for all the equipment, the initial round of equipment, which I think was around $10,000. How does that show his supervision under the application notes? How does that show his management or supervision of one or more other participants? Well, Your Honor, I think as we went through them, I think it shows decision-making authority when he allows them to come on the property and he purchased everything to get it started. The recruitment of accomplices. Again, they would not be on that property or even know that property existed. Right, but I meant the purchase. Well, I think it gets tied to the fourth factor in claimed right to a larger share because it's, as the defendant stated, because he put forth this initial investment, he was getting a larger share of the profits from the marijuana grow. So is that factor applicable? In other words, there's a basis for his claimed right to a larger share, the fact that it was his property rather than the fact that he was spending time managing or supervising. Our position is that, yes, that is applicable under the claim right to a larger share. You made reference, I think, to him pulling a gun on Armando when he suspected Armando would be cooperating with law enforcement. Correct. And does that show managerial or supervisory as far as saying, look, don't you start cooperating with law enforcement? And you say that to somebody at gunpoint. Our position is, yes, especially if not before, once he makes that threat, and given the fact that they're on his land, I think that certainly shows an exercise of authority over Armando Verdugo. You better not cross me. Correct. And I think at sentencing, we obviously didn't have any testimony from witnesses, but defense counsel, who was not Ms. Albro at the time, as the government stated in its brief, we had the co-defendants there to testify. While it's not in the pre-sentence report, Ms. Baker acknowledged that Ryan Harris was also there to testify to threats, which was something that we would have done had we felt the need to have him testify. So while it's not in the pre-sentence report, it was acknowledged to some extent by appellant's counsel at sentencing that there was more than one co-defendant who would say that they were threatened by Mr. Steffen. I don't think there's any dispute that Mr. Steffen brought weapons onto the property. I believe their position was that they just weren't related to the marijuana grow on the property. Anything further? Unless any of your honors have any questions, I will go ahead and sit down. We don't. Thank you. Ms. Albro, we're happy to hear from you. Thank you, Your Honor. I just wanted to address a couple of the issues raised by the government. First of all, the standard of review issue, it seems to be very important, so I want to make sure I point out the way the government stated the standard of review in their brief was that an offense enhancement is reviewed for clear error, and they cited to Cameron. And I just want to read verbatim what Cameron says. And what Cameron says is, we review all sentences for reasonableness under an abusive discretion standard. And then they quoted to the United States v. Allen case saying, in assessing whether a sentence court properly applied the guidelines, we review the court's factual findings for clear error and its legal conclusions de novo. Again, it's up to you to decide whether we're dealing with the facts here or the application and whether a legal issue was decided incorrectly. But I want to point out that the way the government worded it, it does not exactly say that. I cannot find anywhere where it says an offense enhancement is reviewed for clear error, which clearly if that was the standard, I would see that me raising the de novo review for a legal issue would not stand. But whether someone's the manager or supervisor, what's the legal analysis? Isn't that a factual analysis? Let me ask you. It's different from probable cause. That's a concept. It can be defined as perhaps less than preponderance, reasonable likelihood, or whatever. They're terms and concepts that have to be applied to existing facts. What terms, concepts, and definitions have to be applied by the trial court to make it a legal analysis in determining whether somebody's the manager or supervisor? Well, the comment to the guideline at issue, it's comment number four, application note four for sentencing guideline 3B1.1, there's a list of seven factors. And I think that once the court determined the facts, which is what we've been discussing, these things about him owning the land and hooking up the electricity, those are the facts. But then the court has to apply the factors in the application note to determine whether legally the facts, as the court found them, make him a manager or supervisor. What is legal about the determination? Because the note talks about the factors which are inherently factual, the nature of the participation in the offense, the recruitment of accomplices, claimed right to a larger share, and I won't go on. But those seem to me to be inherently factual. So what makes them legal? Simply because there are a number of them that the court has to consider? No. That then turns it into a legal determination? I don't think it's the number of them. I just think that because the guidelines are given as to whether this fact is a decision-making authority, that becomes the legal issue. But every single fact is found with some sort of legal background. I mean, there's no such thing as fact-finding in a total vacuum. There's always some legal construct or legal background that leads you to determine what facts are relevant. I agree. No, this is the whole point, is that we're trying to sort of take the clear-error standard and reduce it to some sort of just totally bare minimum, where the only thing that's under clear-error standard is a particular finding of primary fact, which it seems to me misses the point, because there are inferences and emanations that go from primary facts, and that a district court is in a much better position to determine, because you hear the person speak. Let's say you hear Mr. Stephan speak in a sentencing hearing, okay? Part of whether he's a manager or supervisor is going to depend upon his manner, and part of whether he's a manager or supervisor is going to depend upon the testimony of other people. And it's not just a primary fact. It's going to be body language. It's going to be tone of voice. It's going to be, you know, how much swagger is in the step. Those are things that are within a district court's province, even though they may involve some minor sort of inference from a primary fact. It doesn't take it out of the realm of fact-finding, and I don't mean to be difficult on you, but I keep hearing all this stuff that every enhancement under the sentencing guideline is going to have to be bifurcated in such a way as to undermine a district court's fact-finding authority, and this trend is disquieting to me. My time is up. Would you like me to respond to that? Of course you can. Okay. I mean, all I can say to that is I think when you're dealing with a statute, which is not the case here, but a sentencing guideline where there's a definition and it has to have a legal definition and there's case law on it like Slade and Cameron, I think that it's very difficult to separate out the facts from the legal issues. Thank you for your time. We thank you.
judges: J. Harvie Wilkinson III, G. Steven Agee, Barbara Milano Keenan